UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BURL WASHINGTON,               )
                               )
        Petitioner,            )
                               )
    vs.                        )        Case No. 4:11CV183 CDP
                               )
UNITED STATES OF AMERICA,      )
                               )
        Respondent.            )

## MEMORANDUM AND ORDER

Burl Washington seeks to vacate, set aside or correct his sentence under 28
U.S.C. § 2255.  Following a four-day jury trial, at which he represented himself,
Washington was convicted of two counts of distribution of a controlled substance
resulting in the death of another person (Counts I and II), see 21 U.S.C. § 841(a)
and (b)(1)(C), and two counts of distribution of a controlled substance (Counts III
and IV), see id. § 841(a).  Criminal Case No. 4:07CR776 CDP.  I sentenced
Washington to 360 months imprisonment on Counts I and II and 240 months
imprisonment on Counts III and IV, to be served concurrently.  Washington
appealed, and the Eighth Circuit Court of Appeals affirmed his conviction and
sentence.  United States v. Washington, 596 F.3d 926 (8th Cir. 2010).[1]

---

[1]Washington's petitions for rehearing and rehearing en banc were denied April 13, 2010.
Id.

Washington petitioned the United States Supreme Court for a writ of certiorari, which was denied.  <u>Washington v. United States</u>, 131 S. Ct. 336 (2010).

Washington then filed the instant § 2255 motion, raising the following grounds for relief:

1) He is "actually innocent;"

2) The government selectively prosecuted him;

3) Prosecutorial misconduct because the Assistant United States Attorney who prosecuted him "violated the Pullman and Younger abstention doctrine, the exhaustion doctrine, and the Anti-Injunction Act;"

4) Prosecutorial misconduct because the AUSA conspired with state prosecutors to obtain a conviction;

5) Prosecutorial misconduct because the AUSA "deceived the district court" "through the intentional use of the federal standard" and "the presumption of regularity;"

6) Prosecutorial misconduct consisting of false declarations and improper statements of facts presented before the grand jury;

7) His indictment was fatally defective;

8) Prosecutorial misconduct consisting of false declarations made to the district court in an application for writ of habeas corpus ad prosequendum;

9) Prosecutorial misconduct when the AUSA presented false testimony at trial;

10) Ineffective assistance of counsel in that "counsel failed to subject

the prosecution's case to meaningful adversarial testing;"

11) Ineffective assistance of counsel because of "a total breakdown of communication between the attorney and his client;"

12) Ineffective assistance of counsel for failing to file a timely objection to the validity of the probable cause evidence used to obtain the arrest warrant;

13) Ineffective assistance of counsel in "the denial of his constitutional right to confrontation;"

14) Ineffective assistance of counsel because counsel failed to interview and subpoena alibi witnesses;

15) Ineffective assistance of counsel for failing to "require the district court to determine whether expert testimony was admissible under Federal Rule of Evidence 702;"

16) Ineffective assistance of counsel for failing to move for severance;

17) Ineffective assistance of counsel for failing "to object to the manifest injustice that would result from the misjoinder of offenses in a single trial;"

18) Ineffective assistance of counsel because counsel allegedly conspired with the AUSA "to perfect fraud on the court;"

19) The Honorable Terry I. Adelman and I were biased against him; and

20) Ineffective assistance of appellate counsel for failing "to seek and retrieve discoverable evidence needed for full understanding of the facts."

The records before me conclusively demonstrate that Washington has no right to

relief.  Washington was assigned two of this Court's most experienced trial

attorneys to represent him.  He refused to cooperate with either of them throughout

the pendency of his case, eventually insisting on representing himself at trial.  I

granted his request after repeatedly advising him that it was a bad idea.  He was

convicted.[2]  Now, in an apparent fit of buyer's remorse, Washington argues that he

is entitled to habeas relief for numerous reasons, all meritless.  Any alleged errors

in Washington's trial were solely of his own making.  Washington is not, as he

claims, "actually innocent" of these crimes.  He was not convicted because of

some nefarious conspiracy, or alleged judicial bias, or because his attorneys were

ineffective.  He was convicted because the jury believed the overwhelming

evidence of his guilt.  Washington may disagree with their verdict, but that is not a

basis upon which to grant § 2255 relief.  After careful consideration of all the

evidence, I will deny Washington's motion without an evidentiary hearing for the

reasons that follow.

<u>Background</u>

On appeal, the Eighth Circuit summarized the background facts as follows:

---

[2]Washington then argued on appeal that I should not have granted him the relief he sought
because he was only attempting to delay going to trial.  Not surprisingly, the Eighth Circuit
rejected that argument.

In November 2005, Heather Deering began purchasing Fentanyl patches and Percocet tablets from Burl Washington two to three times a week. Washington also provided Fentanyl patches and Percocet tablets to Lacy Cole, Deering's best friend. Washington removed the manufacturer's labels from the Fentanyl patches prior to distributing them.

John Lochirco, Deering's boyfriend, and his best friend, Justin Knox, expressed interest in the Fentanyl patches, so Deering contacted Washington and introduced him to Lochirco. Lochirco contacted Washington on his cellular phone in order to arrange drug purchases, and Lochirco and Knox, together, met Washington on multiple occasions in order to purchase Fentanyl patches and Percocet tablets (and did not purchase Fentanyl from any other source).

At the end of their work day on March 10, 2006, Lochirco and Knox met Washington at a parking lot in Park Hills, Missouri. Lochirco and Knox pooled their money and purchased two Fentanyl patches (Washington had removed the packaging from the patches) and Percocet tablets. Lochirco and Knox went to Lochirco's residence at 7381 Highway 32 in Ste. Genevieve County, Missouri. Knox orally ingested the Fentanyl patch. Lochirco did not see Knox take any Percocet tablets but was "sure" that Knox did so. (Trial Tr. vol. I, 155.) Knox was "visibly messed up" and fell asleep on the floor. ( Id. at 156.) That night Deering talked to Lochirco, and Lochirco told her that he and Knox were "really messed up." (Trial Tr. vol. II, 356.) When it was time to go to work on the morning of March 11, 2006, Lochirco attempted to wake Knox and saw that Knox was not breathing. Lochirco called 911 and attempted to revive Knox but was unable to do so.

Law enforcement, including Detective Sergeant Michael Stacy of the Ste. Genevieve County Sheriff's Department, and emergency medical personnel arrived at Lochirco's residence and found Knox dead. Lochirco told law enforcement officials that Washington was responsible for Knox's death. The autopsy report on Knox's body included the finding that Knox died of a mixed narcotics overdose

involving Fentanyl and Oxycodone.

After Knox's death, Deering provided information to the police about her past purchases of Fentanyl patches and Percocet tablets from Washington. Deering agreed to make a controlled purchase from Washington. On March 16, 2006, law enforcement outfitted Deering's residence with a recording device. Deering placed a call to Washington's cell phone to request the narcotics. Law enforcement also conducted surveillance outside Deering's residence. Officers recorded the meeting between Deering and Washington during which Washington provided her with two Fentanyl patches in exchange for $105 which law enforcement had provided to her to make the purchase. Detective Stacy applied for an arrest warrant for Washington based on the autopsy report and the controlled drug purchase.

On April 19, 2006, Deering assisted law enforcement in locating Washington by placing a monitored call to him and requesting Fentanyl patches. After the call, Trooper Nathan Benson of the Missouri State Highway Patrol observed Washington driving. Trooper Benson stopped Washington, informed him of his Miranda rights, and asked if there was anything illegal in the vehicle. Washington replied that there was not and that he had some patches for a back injury he had sustained. Trooper Benson found multiple Fentanyl patches in the search of Washington's car. Washington was taken to the police station and interviewed by Detective Stacy. Washington asserted that he had the Fentanyl patches because they had been prescribed to him by his doctor for pain.

Washington, 596 F.3d at 932 -933 (internal footnotes omitted).

On December 20, 2007, a federal grand jury returned a four-count

indictment against Washington. Count I alleged that on or about March 10, 2006,

in St. Francois County, Missouri, Washington distributed Fentanyl, a Schedule II

controlled substance, in violation of 21 U.S.C. § 841(a), and that the death of

Justin Knox resulted from the use of the Fentanyl distributed by Washington in

violation of 21 U.S.C. § 841(b)(1)(C). Count II charged that on or about March

10, 2006, Washington distributed Oxycodone, a Schedule II controlled substance,

in violation of 21 U.S.C. § 841(a), and that the death of Justin Knox resulted from

the use of the Oxycodone distributed by Washington in violation of 21 U.S.C. §

841(b)(1)(C). Count III alleged that on or about March 16, 2006, Washington

distributed Fentanyl in violation of 21 U.S.C. § 841(a), and Count IV charged that

on or about April 19, 2006, Washington possessed with intent to distribute

Fentanyl in violation of 21 U.S.C. § 841(a). Id. at 933.

Assistant Federal Public Defender Janis Good was initially appointed to

represent Washington, but Magistrate Judge Adelman granted her request to

withdraw as counsel on February 27, 2008, because her relationship with

Washington was "irretrievably broken." Id. at n.7. Thereafter, attorney Ronald

Jenkins was appointed to represent Washington. Jenkins filed various pretrial

motions, and while they were under consideration Washington filed a pro se

motion alleging that he had received "insufficient assistance of counsel." Judge

Adelman held an ex parte hearing to address the motion and urged Washington to

continue to work with Jenkins. Judge Adelman then denied the motion, and

Jenkins continued to represent Washington and file various pretrial notices and motions on his behalf.  Id, at 933-34.

Washington's trial was set to begin before me on June 16, 2008. Washington filed a pro se motion to be heard, so I let him speak on his own behalf before jury selection began on June 11, 2008.  Washington then rambled on at length, arguing about the government's case and demanding that I simply dismiss the charges against him.  When I refused and explained that those types of arguments should be directed to the jury, Washington became agitated and started complaining about Jenkins.  After Jenkins conducted voir dire and the jury was selected, Washington announced to me that he wanted to proceed pro se.  I strongly advised him against doing so, but I eventually found that he voluntarily waived his right to counsel and released Jenkins from further representation. Armed with Jenkins' notes for cross-examination of each of the government's witnesses, Washington represented himself for the remainder of the trial.  Id. at 933-34.

At the conclusion of the government's case, Washington claimed that he was "getting sick" and requested a doctor.  I granted his request, and Washington was treated for anxiety at St. Joseph's Health Center in St. Charles, Missouri.  He was found "fit for confinement and fit for trial from a medical standpoint."  Id. at

934-35. Despite his diagnosis, Washington argued that he was entitled to a mistrial due to his health condition. He also cited his lack of legal experience and time to prepare for trial as reasons for granting a mistrial. Id. at 935. I denied the request, and the jury found him guilty on all counts. Id.

Prior to sentencing, Washington filed numerous meritless pro se motions and objections to the presentence report. I denied these motions and objections during the sentencing hearing on September 12, 2008, but at Washington's request, I continued the hearing and appointed standby counsel Daniel Juengel to represent him at sentencing. Id. The sentencing hearing resumed on November 7, 2008. I allowed both Washington and Juengel to speak at the sentencing hearing, and at its conclusion I sentenced Washington to an aggregate term of 360 months imprisonment on Counts I and II and 240 months on Counts III and IV, to be served concurrently. I also imposed a five-year term of supervised release and ordered restitution in the amount of $6,768.86 to Knox's mother for funeral expenses.

## Discussion

A.    *No Evidentiary Hearing is Required*

I will not hold an evidentiary hearing on this matter. "A petitioner is entitled to an evidentiary hearing on a section 2255 motion unless the motion and

the files and records of the case conclusively show that he is entitled to no relief."

Anjulo-Lopez v. United States, 541 F.3d 814, 817 (8th Cir. 2008) (internal

quotation marks and citation omitted).  "No hearing is required, however, where

the claim is inadequate on its face or if the record affirmatively refutes the factual

assertions upon which it is based."  Id. (internal quotation marks and citation

omitted).  Here, when I consider the file as a whole I find that Washington's

claims are inadequate on their face and conclusively refuted by the record.   For

this reason, I also find that appointment of counsel is not warranted.  The motion

is denied for the reasons that follow.

     B.    *Grounds Previously Decided Adversely to Washington*
           *on Appeal Cannot be Relitigated Here*

"It is well settled that claims which were raised and decided on direct appeal

cannot be relitigated on a motion to vacate pursuant to 28 U.S.C. § 2255."  Bear

Stops v. United States, 339 F.3d 777, 780 (8th Cir. 2003) (internal quotation

marks and citation omitted); see also, Thompson v. United States, 7 F.3d 1377,

1379 (8th Cir. 1993) (citing United States v. Holtzen, 718 F.2d 876, 878 (8th Cir.

1983)).  Here, Washington complains that the evidence presented at trial was

insufficient to support his conviction.[3]  This argument was rejected by the Eighth

---

[3]It appears this argument supports Washington's first ground for relief as well as one of
his ineffective assistance of counsel claims.

Circuit on direct appeal and cannot be relitigated here.

On appeal, the Eighth Circuit rejected Washington's arguments regarding

the sufficiency of the evidence used to convict him as follows:

> Washington next argues that there is insufficient evidence to support
> his convictions on Counts I and II. Washington asserts that the
> government presented evidence that he distributed Fentanyl patches
> and Percocet tablets to a person that ultimately distributed those drugs
> to the victim, Justin Knox. However, Washington contends that the
> evidence presented at trial was not that Knox was killed by ingesting
> Fentanyl patches or Percocet tablets, individually, but that his death
> resulted from a mixed narcotic overdose such that the evidence does
> not support the guilty verdicts on either Counts I or II. Washington
> further argues that there is insufficient evidence to sustain the jury's
> guilty verdict on Count II because the evidence presented at trial
> showed that acetaminophen, one of the key ingredients in Percocet
> tablets, was not found in Knox's system.

> "We review the sufficiency of the evidence de novo, viewing the
> evidence in the light most favorable to the government, resolving
> evidentiary conflicts in the government's favor, and drawing all
> reasonable inferences in favor of the jury's verdict." United States v.
> Stymiest, 581 F.3d 759, 764 (8th Cir. 2009).

> We will uphold a jury verdict if substantial evidence supports it.
> Substantial evidence exists if a reasonable minded jury could have
> found the defendant guilty beyond a reasonable doubt. This standard
> of review is a strict one; we will not lightly overturn the jury's
> verdict. Reversal is appropriate only where a reasonable jury could
> not have found all the elements of the offense beyond a reasonable
> doubt. United States v. Cruz, 285 F.3d 692, 697 (8th Cir. 2002)
> (citations and quotation omitted). To resolve the sufficiency
> challenge, we must examine the government's evidence as to the
> cause of Knox's death.

Dr. Christopher Long directs the forensic toxicology laboratory at the St. Louis University School of Medicine Department of Pathology. (Trial Tr. vol. II, 219.) He is also the chief toxicologist for St. Louis County. (Id.) Dr. Long analyzed blood and urine samples from the decedent's body and issued a toxicology report. (See id. at 221.) Dr. Long testified that the toxicology report for the decedent was positive for Diazepam (Valium), Nordiazepam (the metabolite of Diazepam), Fentanyl, Oxycodone, and Oxymorphone (the metabolite of Oxycodone). ( Id. at 224–26, 229.) Dr. Long stated that the Diazepam was present at a generally therapeutic level and did not cause Knox's death. ( Id. at 224–25.) Similarly, Dr. Long stated that the Nordiazepam was not at a lethal level. ( Id. at 225.)

Dr. Long explained that .2 micrograms per milliliter or greater of Oxycodone in the bloodstream is generally considered to be fatal. (Id. at 226.) Oxycodone was present in the decedent's blood at a level of .05 micrograms per milliliter, which Dr. Long stated is a low level. (Id.) However, Oxycodone was present in the decedent's urine at a level greater than two micrograms per milliliter. (Id. at 228.) Dr. Long observed that this "shows that he had a significant concentration of Oxycodone in [his] blood" at one time and means that Oxycodone "could have been" present in his system in "a fatal amount." ( Id. at 228–29.)

Dr. Long stated that the average lethal level of Fentanyl in the bloodstream is eight nanograms per milliliter. (Id. at 226.) Fentanyl was present in the decedent's blood at 5.3 nanograms per milliliter, and, although this is lower than the average lethal level, Dr. Long stated that 5.3 nanograms "is consistent with concentrations that have produced a lethal result." (Id. at 225–26.) Fentanyl was present in the decedent's urine at a level greater than 200 nanograms per milliliter, which Dr. Long explained "supports the blood as having [contained] a fatal level." (Id. at 227–28.)

In terms of the cause of Knox's death, Dr. Long stated, "Generally speaking, you'd be looking at poli-pharmacy, because you have the three drugs; the Oxycodone, you have some Diazepam, and of course

you have Fentanyl.  Fentanyl is the big dog in the bunch.  That is the one that could have been fatal of and by itself without needing anything else.  The other drugs did aid and assist." (Id. at 229.) Dr. Michael Zaricor is a pathologist at Mineral Area Regional Medical Center in Farmington, Missouri.  (Trial Tr. vol. II, 192.)  For the past 28 years, Dr. Zaricor has performed "autopsies for several counties in southeast Missouri to determine cause and manner of death." (Id.)  Dr. Zaricor performed an autopsy on Knox's body and issued a report as to the manner and cause of his death. (Id. at 194–95.)  In addition to the findings that he made from his examination of the decedent's body, Dr. Zaricor reviewed Dr. Long's toxicology report in order to determine the manner and cause of death. (Id. at 196–97.)  Dr. Zaricor determined that "[t]he cause of [Knox's] death was a mixed narcotic overdose of Fentanyl and Oxycodone." (Id. at 199.)  Dr. Zaricor explained that death caused by an overdose of Fentanyl and Oxycodone usually results from respiratory arrest, although "[i]t can also cause cardiac arrest, coma, [and] seizures[.]" (Id.)  Dr. Zaricor further testified that "[a]t the time of death, I'm sure either the Fentanyl or the Oxycodone was in lethal levels [in Knox's blood][,]" (id. 214–15), and that, independently of one another, each drug was present in the decedent's system in significant enough levels to kill him, (id. at 199–200).

Count I requires that the government prove that Washington: (1) intentionally distributed Fentanyl to another person, (2) knew that Fentanyl was a controlled substance at the time of the distribution, and (3) the death of Justin Knox resulted from the use of the Fentanyl distributed by Washington.  See 21 U.S.C. § 841(a), (b)(1)(C). Washington only contests the sufficiency of the evidence as to the third element.  Dr. Long testified that the level of Fentanyl present in the decedent's urine indicated that his blood had contained a "fatal level" of Fentanyl.  (Trial Tr. vol. II, 227–28.)  Dr. Zaricor testified that Fentanyl was present in the decedent's system in a significant enough amount to cause his death, even without the presence of Oxycodone. (Id. at 199–200.)  In light of the standard of review, see Stymiest, 581 F.3d at 764, this testimony requires us to sustain Washington's conviction on Count I.

Count II requires that the government prove: (1) Washington intentionally distributed Oxycodone to another person, (2) at the time of the distribution, Washington knew that it was a controlled substance, and (3) the death of Justin Knox resulted from the use of the Oxycodone distributed by Washington.  See 21 U.S.C. § 841(a), (b)(1)(C).  Again, Washington challenges only the third element. Dr. Zaricor testified that, at one time, Knox's system contained a significant enough amount of Oxycodone to cause his death, absent the Fentanyl.  (Trial Tr. vol. II, at 199–200.)  Bound by the standard of review, see Stymiest, 581 F.3d at 764, we must affirm Washington's conviction on Count II based on this testimony.

Washington also contends that Count II is not supported by sufficient evidence because: (1) Count II is premised on the fact that Washington distributed Percocet tablets that were ultimately distributed to Knox and (2) one of the key ingredients in Percocet, acetaminophen, was not found in the decedent's system.  However, both Dr. Long and Dr. Zaricor testified that, even though the decedent's urine was not tested for acetaminophen, it is still possible that he ingested Percocet tablets in light of the fact that acetaminophen is metabolized about twice as fast as Oxycodone. (Trial Tr. vol. II, 230.)  Dr. Zaricor further testified that, because there was only a small amount of Oxycodone present in the decedent's blood, "it ... ma[d]e sense that the acetaminophen ... ha[d] already metabolized and would not show up."  (Id. at 217.)  In view of the standard of review, see Stymiest, 581 F.3d at 764, this testimony is certainly sufficient to demonstrate that Knox ingested the Oxycodone that resulted in his death via the Percocet tablets that Washington had distributed.

Finally, Washington argues that his convictions on Counts I and II must be reversed because "[b]oth of the ... counts were for the death of the same individual."  (Appellant's Br. 53.)  Section 841(b)(1)(C) is an enhanced penalty provision, imposing a mandatory minimum of 20 years imprisonment if the defendant distributes a specified controlled substance and "death or serious bodily injury results from the use of" the substance. 21 U.S.C. § 841(b)(1)(C).  "From the

statute's language, it is clear that Congress intended to expose a defendant to a more severe minimum sentence whenever death or serious injury is a consequence of the victim's use of a controlled substance that has been . . . distributed by the defendant." <u>United States v. Monnier</u>, 412 F.3d 859, 861 (8th Cir. 2005) (<u>quoting United States v. McIntosh</u>, 236 F.3d 968, 972 (8th Cir. 2001)). We have already determined that the evidence was sufficient for the jury to conclude that Washington distributed Fentanyl that, in and of itself, resulted in the death of Justin Knox. Similarly, we have concluded that sufficient evidence supports the jury's verdict that Washington distributed Oxycodone that resulted in Knox's death. Thus, Washington was convicted of two distributions that resulted in death. We cannot see any reason why the fact that the distributions at issue resulted in the same death means that Washington cannot be convicted for each distribution, and, as in McIntosh, "decline to hinder Congress's will, apparent from the face of the statute, through a judicial pronouncement that the statute requires more than it says." 236 F.3d at 972.

<u>Washington</u>, 596 F.3d at 942 -945 (internal footnotes omitted).

Whether couched as a direct claim or as one for ineffective assistance of counsel, any claims based on the argument that the evidence was insufficient to convict him fail. Therefore, Ground 1 of his § 2255 motion fails, as do any ineffective assistance of counsel claims raising this argument.[4]

---

[4]To the extent Ground 1 is an attempt to assert a freestanding claim of actual innocence, it fails as actual innocence is merely a gateway to review otherwise procedurally defaulted claims and is not an independent ground for relief. <u>See</u> <u>McQuiggin v. Perkins</u>, 133 S. Ct. 1924, 1931 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); <u>Herrera v. Collins</u>, 506 U.S. 390, 400-02, 404-05 (1993) (noting that "[c]laims of actual innocence based on newly discovered have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding;" stating that the "body of [the Supreme Court's] habeas jurisprudence makes clear that a claim of 'actual innocence' is not itself a

C.   *Arguments That Could Have Been Raised on Direct*
     *Appeal But Were Not Are Precluded From Review in*
     *This § 2255 Proceeding Absent A Sufficient Showing To*
     *Avoid the Procedural Bar*

"A collateral challenge may not do service for an appeal." United States v.

Frady, 456 U.S. 152, 165 (1982).  "[N]ormally a collateral attack should not be

entertained if defendant failed, for no good reason, to use another available avenue

of relief." Poor Thunder v. United States, 810 F.2d 817, 823 (8th Cir. 1987)

(internal citation omitted).  Grounds 2 through 9 and 19 were not raised on direct

appeal.  If a claim could have been raised on direct appeal but was not, it cannot

be raised in a § 2255 motion unless the movant can show both (1) a "cause" that

excuses the default, and (2) "actual prejudice" resulting from the errors of which

he complains.  See Ramey v. United States, 8 F.3d 1313, 1314 (8th Cir. 1993);

Mathews v. United States, 114 F.3d 112, 113 (8th Cir. 1997).[5]

---

constitutional claim;" and concluding that petitioner was not entitled to relief because he claimed
he was "entitled to habeas relief because newly discovered evidence show[ed] that his conviction
[wa]s factually incorrect"); Burton v. Dormire, 295 F.3d 839, 848 (8th Cir. 2002) ("[W]e have
squarely rejected the notion that a prisoner may receive a writ simply because he claims he is
innocent . . . [T]hus [the petitioner]'s claim of innocence does not entitle him to a writ.").

[5]A movant can also avoid procedural default by demonstrating actual innocence. Johnson
v. United States, 278 F.3d 839, 844 (8th Cir. 2002) ("In order to obtain collateral review of a
procedurally defaulted issue, a § 2255 movant must show either cause and actual prejudice, or
that he is actually innocent.") (internal quotation marks and citations omitted).  Actual innocence
is a strict standard that generally cannot be met "where the evidence is sufficient to support a
conviction on the charged offense." Id. (internal quotation marks and citation omitted).  For the
reasons just discussed, Washington is not actually innocent because the evidence was sufficient
to support his convictions.

Although not directly argued by Washington, his § 2255 motion does assert an ineffective assistance of appellate counsel claim. Although the "cause and prejudice" that must be shown to consider a procedurally defaulted claim may include ineffective assistance of counsel, see Becht v. United States, 403 F.3d 541, 545 (8th Cir. 2005), here Washington's complaints regarding his appellate counsel do not specifically include his failure to argue alleged prosecutorial misconduct and judicial bias to the Eighth Circuit.[6] For this reason, Washington has not adequately alleged sufficient cause and prejudice to overcome the procedural default of these claims.

Even if he had adequately alleged cause and prejudice, Washington still cannot demonstrate that his appellate counsel was ineffective. The Sixth Amendment establishes the right of the criminally accused to the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). To state a claim for ineffective assistance of counsel, Washington must prove two elements of the claim. First, he "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel

---

[6]"Actual prejudice" requires a showing that the alleged error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Johnson v. United States, 278 F.3d 839, 844 (8th Cir. 2002) (internal quotation marks and citation omitted).

was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." Id. at 687. In considering whether this showing has been accomplished, "judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. The courts seek to "eliminate the distorting effects of hindsight" by examining counsel's performance from counsel's perspective at the time of the alleged error. Id. Second, Washington "must show that the deficient performance prejudiced the defense." Id. at 687. This requires him to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. The court need not address both components if the movant makes an insufficient showing on one of the prongs. Engelen v. United States, 68 F.3d 238, 241 (8th Cir. 1995).

Washington argues that his appellate counsel was ineffective for failing to "conduct discovery" and request documents. Yet appellate counsel does not conduct discovery; he merely argues errors made during trial, and counsel cannot, as a matter of law, be ineffective for failing to make a meritless argument on appeal. Rodriguez v. United States, 17 F.3d 225, 226 (8th Cir. 1994).

Here, Washington's allegations regarding prosecutorial misconduct and judicial bias are completely meritless. He raised these arguments numerous times over the course of his criminal case, in pro se filings and in hearings before Judge

Adelman and me.  Essentially, Washington's claims of prosecutorial misconduct all stem from his belief that the government witnesses lied in grand jury proceedings and at trial.  "[T]he prosecution may not use or solicit false evidence, or allow it to go uncorrected."  United States v. Martin, 59 F.3d 767, 770 (8th Cir. 1995).  "To prove prosecutorial use of false testimony, [Washington] must show that" (1) the prosecution used perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a 'reasonable likelihood' that the perjured testimony could have affected the jury's judgment."  Id.  Here, Washington has no actual evidence of any perjury.  Washington mischaracterizes and misquotes various transcripts and documents, some of which were never even admitted at trial, in an attempt to prove that these witnesses were lying.  Although his supporting and reply briefs ramble on for 300 pages, they still fail to put forward even a scintilla of evidence establishing that any witness lied before the grand jury or at trial or that the government knowingly assisted in or condoned perjury.  As I explained to Washington on the first day of trial, "[T]here is no way to stop the case because you think it is wrongly brought . . . The jury will decide."  [Doc. #121 at 7].  The jury did decide.  They decided that Washington was guilty after hearing all the evidence, including the testimony of the government's witnesses.  Washington had the opportunity to cross-examine these witnesses, to

point out any alleged inconsistencies in their testimony, and to argue to the jury that they were not credible. The jury chose to believe the government's evidence. That Washington disagrees with the witnesses' testimony and the jury's verdict is not a basis for granting habeas relief, and there is certainly no evidence that the prosecutor engaged in any misconduct in prosecuting the case against Washington. Washington's allegations are not made any less baseless just because he repeats them again and again. There is no evidence of a prosecutorial conspiracy, no evidence of selective prosecution,[7] and no evidence of any perjured testimony used to convict Washington. Therefore, appellate counsel was not ineffective for failing to raise these arguments on appeal, these claims remain procedurally defaulted, and they fail on the merits in any event.

The same is true of Washington's defaulted argument that the indictment against him was "fatally defective." I denied his motion to dismiss on this basis

---

[7]To prevail on a claim of selective prosecution, Washington must show that "(1) he was singled out for prosecution while others similarly situated were not prosecuted for similar conduct, and (2) the decision to prosecute him was based on impermissible motive such as race, religion, or an attempt by the defendant to secure other constitutional rights." United States v. Scott, 610 F.3d 1009, 1017 (8th Cir. 2010) (internal quotation marks and citation omitted). Here, Washington offers no evidence of a "similarly situated" person or evidence that his prosecution was based on "race and retaliation" as he claims. Even if Lochirco made a racially charged remark about Washington during the course of the underlying investigation of Knox's death, there is no evidence that the prosecutor ever endorsed this statement, shared in this belief, or that the statement played any part in the decision to prosecute Washington. Lochirco is a private citizen, not an agent of the government.

before trial, explaining that it was the jury's job to decide who was telling the truth. Appellate counsel was not ineffective for failing to raise this meritless (and now procedurally barred) argument on appeal.

Grounds 3 and 5 can be summarily denied as meritless because these doctrines have no application in the instant proceeding and do not entitle Washington to habeas relief.[8]

As for his complaints of judicial bias in Ground 19, Washington raised these before me during the course of his trial. Washington believes that Judge Adelman and I harbored some bias against him because we did not dismiss the case against him or grant some of his other pro se motions. As I explained to Washington at that time, disagreement with judicial rulings cannot form a valid basis for a bias or partiality motion. Liteky v. United States, 510 U.S. 540, 555-6 (1994). Counsel was not ineffective for failing to raise this meritless argument on appeal.

Washington cannot avoid the procedural default of Grounds 2 through 9 and 19 because his attorney was not ineffective for failing to raise these meritless arguments on appeal. Even if Washington's allegations of ineffective assistance of counsel were sufficient to constitute cause and prejudice to excuse his

---

[8]In these grounds, Washington claims the prosecutor violated the Pullman and Younger abstention doctrines, the exhaustion doctrine, and the Anti-Injunction Act, as well as using "the federal standard" and "the presumption of regularity."

otherwise procedurally defaulted claims, Washington cannot prevail on the merits of his claims for the reasons discussed. Therefore, Grounds 2 through 9 and 19 will be denied.

      D.     *Washington did not receive ineffective assistance of counsel*

Washington's remaining claims are for ineffective assistance of trial and appellate counsel. In the previous section, I set out the standards applicable to ineffective assistance of counsel claims and will not do so again here. Under these standards, Washington did not receive ineffective assistance from either trial attorney Jenkins or appellate attorney Juengel. Therefore, the remaining Grounds of Washington's § 2255 motion will be denied.

Washington first complains that attorney Jenkins "failed to subject the prosecution's case to meaningful adversarial testing." It is important to note, however, that Jenkins did not represent Washington during trial because Washington insisted on firing him and representing himself. Therefore, to the extent Washington believes the government's case was not "subjected to meaningful adversarial testing" during trial, Washington has only himself to blame. His errors, however grave, cannot be imputed to Jenkins and do not form

the basis of an ineffective assistance of counsel claim.[9]

To the extent Washington's claims extend to Jenkins' pretrial preparation, they are conclusively refuted by the records in this case. Jenkins filed numerous pretrial motions on Washington's behalf.[10] That they were ultimately denied does not lead to the conclusion that these motions were frivolous (as argued by Washington) or that Jenkins' representation was somehow deficient. The same is true of Washington's argument that Jenkins somehow denied him "his constitutional right to confrontation." In preparation for trial, Jenkins compiled cross-examination folders for each of the government's anticipated witnesses. These folders included an outline for cross-examination. Jenkins gave these folders to Washington, and he used them during trial. In fact, Jenkins' notes and outlines made Washington better prepared to represent himself than most pro se

---

[9]I reach the same conclusion with respect to Washington's argument that Jenkins somehow rendered ineffective assistance of counsel "because of a total breakdown of communication between the attorney and his client." Any "total breakdown of communication" between Jenkins and Washington is solely the result of Washington's obstreperous behavior and cannot be attributed to Jenkins, who continued to represent his client capably and professionally despite repeated, spurious accusations by Washington. Washington's deliberate refusal to cooperate with his attorney extended not only throughout his representation by Jenkins, but also throughout the duration of his representation by Good, who was eventually relieved from representing Washington because her relationship with him was "irretrievably broken." Washington, 596 F.3d at 933 n.7.

[10]As acknowledged by the Eighth Circuit, not only did Jenkins file a motion to suppress, he "went on to file various pretrial notices and motions on behalf of Washington." Washington, 596 F.3d at 933-34.

litigants. Any deficiencies in the cross-examination of trial witnesses are attributable solely to Washington, not Jenkins.

Nor was Jenkins ineffective for failing to file a motion for bill of particulars[11] or a motion to suppress physical evidence seized in connection with his arrest.[12] Here, Washington cannot demonstrate that he was prejudiced by any alleged failure to file a motion for a bill of particulars because he has not identified any new information that he believes would have been produced had I ordered a bill of particulars. Washington fails to explain how a bill of particulars containing the same information that was already provided to him by the government before trial would have better prepared him for trial or assisted him with his defense strategy, which was essentially to attack the credibility of the government's witnesses. See Livingstone, 576 F.3d at 883-84 (defendant cannot demonstrate prejudice from failure to obtain bill of particular where defense strategy was to attack credibility of government's witnesses, and defendant did "not indicate how

---

[11]A bill of particulars "serves to inform the defendant of the charge against him with sufficient precision to enable him to prepare for trial," United States v. Hernandez, 299 F.3d 984, 989 (8th Cir. 2002), but it is "not a discovery device to be used to require the government to provide a detailed disclosure of the evidence that it will present at trial." United States v. Livingstone, 576 F.3d 881, 883 (8th Cir. 2009). I explained this to Washington at the start of his trial.

[12]As noted, Jenkins did file a motion to suppress telephone recordings, so any argument based on a failure to move for suppression of that evidence necessarily fails.

pretrial knowledge of their testimony would have assisted him in doing that.").

Washington also suffered no prejudice from Jenkins' alleged failure to file a motion to suppress the evidence seized from his vehicle on the date of his arrest, as any such motion would have been denied.[13] At the time of his traffic stop and arrest, Washington was already the subject of an arrest warrant because he had been taped agreeing to meet Deering and provide her with Fentanyl patches. Washington, 596 F.3d at 933. Therefore, officers had probable cause to believe that Washington was attempting to engage in a drug transaction with Deering and that he had contraband in his vehicle. Moreover, insomuch as the search of Washington's vehicle occurred incident to his arrest pursuant to a valid warrant, it was lawful. See Arizona v. Gant, 129 S. Ct. 1710, 1719 (2009). Because any motion to suppress the evidence obtained from Washington's traffic stop and subsequent arrest would have been denied as meritless, Jenkins was not ineffective for failing to file such a motion and Washington was not thereby prejudiced.

Washington also complains that Jenkins failed to move for severance or "object to the manifest injustice that would result from the misjoinder of offenses in a single trial." Because Jenkins cannot be ineffective for failing to make a

---

[13]Washington's brief makes mention of the "silver platter doctrine," which "has long been discredited." United States v. Johnson, 707 F.2d 317, 321 n.6 (8th Cir. 1983). To the extent Washington's claim relies upon a long discredited doctrine, it is summarily denied.

meritless argument, these claims must be denied. Counts I and II could not have been severed because they pertained to the same transaction, <u>see</u> Fed. R. Crim. P. 8, and Counts III and IV should not have been severed because they constituted parts of a common plan or scheme. <u>Id.</u> Moreover, as the evidence on each of these counts would have been admissible in a separate trial on the other counts under Federal Rule of Evidence 404(b), Washington suffered no prejudice from Jenkins' alleged failure to move for severance. <u>See</u> <u>United States v. Boyd</u>, 180 F.3d 967, 983 (8th Cir. 1999).[14]

The same is true of Washington's argument that Jenkins was ineffective for failing to file a motion to exclude expert testimony under Federal Rule of Evidence 702. First, three of the witnesses Washington mentions in connection with this claim were never identified as witnesses and did not testify at trial, so counsel could hardly be ineffective for failing to move for their exclusion.[15] The expert witnesses who testified were a pathologist (Dr. Zaricor) and a toxicologist

---

[14]To the extent Washington is attempting to argue that Count I should have been severed from Count II, that argument is foreclosed by the Eighth Circuit's conclusion that the offenses were properly charged in light of the testimony that either of the two drugs found in Knox's body would have caused his death. <u>Washington</u>, 596 F.3d at 945.

[15]These alleged witnesses are Tracy Bourbon, John Lee, and Shane McGoogan. Washington's argument makes no sense with respect to these individuals because he also argues that Jenkins should have interviewed these witnesses in support of his case. Yet a party would never move to exclude the testimony of his own witness. Moreover, there is no indication that any of these individuals would be considered an expert witness even if they had been identified.

(Dr. Long), and Washington identifies no arguable basis for either limiting or excluding their opinions. Their testimony was based on sound and reliable methodology, and there was nothing novel or controversial about their opinions. Washington's bald assertion that, had such a motion been filed, I would have granted it, is based on nothing more than his own fanciful speculation. As Jenkins cannot be ineffective for failing to file a meritless motion, Washington's ineffective assistance claim fails.

Washington next argues that Jenkins was ineffective for failing to interview two officers who were allegedly involved with the controlled buy and taped conversations between Deering and Washington and his subsequent arrest. Washington fails to articulate what these officers would say that would in any way assist in his defense. Although Washington continues to insist, "It wasn't really me" who was taped talking to Deering and who sold her the Fentanyl patches, there is absolutely no evidence to suggest that these officers would corroborate his version of events. As such, Washington cannot demonstrate that he was prejudiced by any such alleged failure by Jenkins.

Moreover, when Washington complained about Jenkins' alleged failure to talk to witnesses on the first day of trial, I expressly asked Washington to identify those witnesses Jenkins allegedly failed to interview. During that lengthy

colloquy, Washington only identified one potential witness — his landlord. Although Washington initially argued that his landlord might possibly provide him with an alibi for the events charged in Count III of the indictment, he conceded upon questioning, "I don't know what he's going to say." (Doc. # 113 at 23-26). When I specifically asked Washington whether there were "any other witnesses you told him that you wanted to investigate," Washington responded, "That's the only one I told him." (Id. at 28). Washington cannot be heard to contradict his prior statements to me.

As for Jenkins' alleged failure to interview Washington's landlord, Washington suffered no prejudice as there is no evidence to suggest that this witness could have actually provided Washington with an alibi for any of the events charged in the indictment, including the distribution charge in Count III. Counts III and IV involve distribution of Fentanyl to Deering. Washington, 596 F.3d at 946. In light of the overwhelming evidence of Washington's guilt on all counts, including the evidence obtained during the controlled buy between Deering and Washington on Count III, Washington was not prejudiced by Jenkins' alleged failure to interview his landlord. See Williams v. United States, 452 F.3d 1009, 1013 (8th Cir. 2006) (movant not prejudiced by attorney's alleged failure to call alibi witness as there was overwhelming evidence of guilt and outcome of trial

likely would not have been different; in evaluating whether movant was prejudiced, court must consider the totality of evidence, including the credibility of all witnesses, the likely impeachment of the uncalled witness, and the strength of prosecution's evidence).

Washington's unfounded allegation regarding an alleged conspiracy between Jenkins and the government will be summarily denied as there is no evidence of any conspiracy "to perfect a fraud on the court" or otherwise.

I have already decided that Washington's appellate counsel was not ineffective for failing to "conduct discovery" and request documents. To the extent Washington argues that his appellate counsel was ineffective for failing to make meritless arguments on appeal, his claim fails as a matter of law. Rodriguez, 17 F.3d at 226.

For these reasons, Grounds 10 through 18 and 20 will be denied.

E.    *I Will Not Issue a Certificate of Appealability*

As Washington has not made a substantial showing of the denial of a federal constitutional right, this Court will not issue a certificate of appealability. See Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997) (citing Flieger v. Delo, 16 F.3d 878, 882-83 (8th Cir. 1994)) (substantial showing must be debatable among reasonable jurists, reasonably subject to a different outcome on appeal or

otherwise deserving of further proceedings).

For all the reasons stated above, Washington's §2255 motion will be denied.

**IT IS HEREBY ORDERED** that Burl Washington's motion to vacate, set aside or correct his sentence under 28 U.S.C. § 2255 [#1] is denied.

**IT IS FURTHER ORDERED** that this Court will not issue a certificate of appealability, as Washington has not made a substantial showing of the denial of a federal constitutional right.

**IT IS FURTHER ORDERED** that all other pending motions [#2, #19, #30, #31] are denied.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 11th day of March, 2014.